## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| THERESA E. MANN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CV 07-B-0764-S |
| | ) | |
| SMITHKLINE BEECHAM CORP., | ) | |
| d/b/a GlaxoSmithKline PLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This case is presently pending before the court on defendant's Motion for Summary Judgment. (Doc. 10.)[1]  Plaintiff Theresa Mann has sued her former employer, defendant SmithKline Beecham Corp., doing business as GlaxoSmithKline [hereinafter GSK], alleging that defendant retaliated against her in violation of Title VII.   Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment, (doc. 10), is due to be granted.

## I. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *See Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991); *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.  Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in her favor. *See id.* at 255.  Nevertheless, the non-moving party need not be given the benefit of ***every*** inference, but only of ***every reasonable*** inference.  *Evans v. Stephens*, 407 F.3d 1274, 1282 (11th Cir. 2005)(quoting *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999)(language from the district court's order, attached as Appendix A and adopted by the court))(Carnes, J., concurring specially).

2

## II. <u>STATEMENT OF FACTS</u>[2]

Mann began working for GSK as a Sales Representative in the Birmingham South Territory in February 1997. (Doc. 12, Ex. A at 62, 73, 109.) As a Sales Representative, Mann was responsible for making calls on physicians and pharmacies to sell GSK's products. (*Id*. at 65-67, 73.) Beginning in 2005, Mann reported to District Sales Manager Anne Ruzic, who in turn reported to Regional Vice President Jack Planchard. (*Id*. at 84, 86; *id*, Ex. B ¶ 2, 4.) Mann worked with two other Sales Representatives, Melanie Anderson and Steve Wald, in the Birmingham South Territory. (*Id*., Ex. A at 77-78.)

GSK has established "sample accountability" policies and procedures on which all Sales Representatives are fully trained prior to being issued drug samples for distribution to physicians. (*Id*., Ex. B ¶ 3.) GSK requires its Sales Representatives to present a "signature card" to the physician receiving the product samples and to obtain the physician's signature on the card documenting the type and quantity of drug samples left with the physician on that date. (*Id*.) In addition, Sales Representatives are required to submit information into GSK's electronic system called "Passport Plus." (*Id*.; *id*., Ex. A at 71.) The "Passport Plus" system lists a Sales Representative's calls, her sampling activities, and the amount of drug samples the Sales Representative has in her inventory. (*Id*., Ex. B, ¶ 3.) GSK audits these records

---

[2]As required when determining a Motion for Summary Judgment, the court has construed the facts in the light most favorable to plaintiff Teresa Mann, the non-moving party. All disputed facts are resolved in her favor, and all reasonable inferences arising from those facts are drawn in her favor. *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990); *Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1455 (11th Cir,. 1997).

periodically.  (*Id*.)  False documentation of sales calls and of sampling activity are violations of GSK's  policy and constitute grounds for termination.  (*Id*.)

In August or September of 2005, plaintiff's District Sales Manager, Anne Ruzic, noticed "unusual activity" regarding her entries in the Passport Plus system.  (*Id*. ¶ 4.)  She reported about Mann's possible misconduct to GSK Human Resources on September 7, 2005. (*Id*., Ex. B, ex. 1 at 1.)  She noted that Mann had reported calls on six closed pharmacies; that she had reported a sales call on Dr. Ammar Shaheen when he was out of town; and that she had recorded five calls on Sundays to physicians' offices that were closed on Sundays.  (*Id*. at 1-2.)

In mid-September 2005, Ruzic learned that Mann had given out-of-date samples to a physician; Ruzic characterized this conduct as "another serious violation of company policy."  (*Id*. ¶ 4 and ex. 1 at 3.)  On September 16, Ruzic spoke with Carrie Stallings in Human Resources; she summarized this conversation as follows:

> The office of Michael Connolly, MD, a Birmingham pulmonologist, complained to . . . Melanie Anderson, that the **Advair samples that [Mann] left on her visits two weeks previous (8/30 and 8/31) were out of date and had expired in 2004**.  This was told to Melanie by Jeralyn . . . who is a staff employee in Dr. Connolly's practice.

(*Id*. ex. 1 at 3 [emphasis in original].)

Ruzic contacted Karen Barnette, Human Resources Manager, by e-mail on October 3, 2005, regarding Mann's possible policy violations.  (*Id*., Ex. B ¶ 5 and ex. 1 at 1.)

4

Barnette referred the matter on to GSK Pharma Compliance Department for an investigation. (*Id*. ¶ 5.)

Lathell Thomas, a Pharma Compliance Officer, investigated Ruzic's concerns. (*Id*. ¶ 6.) Thomas met with Mann to discuss the alleged policy violations on November 30, 2005. (*Id*., Ex. A at 107-09 and ex. 4 at 2; *id*., Ex. B ¶ 6.)

Thomas made four findings in his investigation:

1. Mann had delivered expired samples to Dr. Michael Connelly on August 30 and August 31, 2005.

2. Mann had reported making calls on closed pharmacies.

3. Mann reported making calls on weekends and Labor Day on physicians' offices that were closed.

4. Mann reported making a call on Dr. Ammar Shaheen on a day Dr. Shaheen was out of the country.

(*See id*., Ex. A, ex. 4 at 1.) His report states:

Background:
This investigation was instituted upon receipt of information that Sales Representative Mann had delivered expired sample products to a Health Care Provider in her territory. The subsequent investigation also revealed call reporting irregularities indicating that Sales Representative Mann had entered false information into GSK records regarding calls on pharmacies and prescribers in her territory, Mann represents Glaxo Pharmaceuticals sales team in the West Alabama (Respiratory) territory. She reports to District Manager Ann[e] Ruzic and Jack Planchard is the TIL RVP. Sales Representative Mann has been employed by GSK since 2/10/97.

Summary of Findings:
This investigation included a review of call and sample activity records generated by Sales Representative Mann for the general time frame of May through November 2005. Irregularities were note[d] as follows:

1.   Information was furnished to Pharma Compliance that Sales Representative Mann had delivered expired samples to the office of Dr. Michael Connolly in Birmingham, AL on 8/30/05 and 8/31/05. *Mann's sample records reflect deliveries of Advair on these dates.*
*Dr. Connolly's office confirmed that Mann had delivered expired Advair samples to his office that had to be thrown out.  These samples had expired in 2004.*

2.   According to GSK records, Mann reported "calls" on pharmacies that were later determined to be closed for business, and these are listed as follows:

Winn Dixie #0532   Vestavia, AL                     8/17/05
Winn Dixie #0529   Alabaster, AL                    8/9/05, 8/31/05
Winn Dixie #0421   Palisades at Homewood, AL        8/16/05
Winn Dixie #0417   HWY 280 Birmingham, AL           8/22/05

*A representative of the Winn Dixie store chain advised that the above stores had closed in the summer of 2005, and were empty of inventory by August 8, 2005.*

Rite Aid #7372       Brookwood, AL                    7/7/05
*A representative of Rite Aid advised that this business closed in May 2005.*

3.   Mann's records reveal call [and] sample activity on weekends, i.e.,
   ○ *Dr. Kimbrell sampled and detailed on 6/19/05 (Sunday),*
   ○ *Dr. Corbin detailed on 6/26/05 (Sunday),*
   ○ *Several HCP sampled and detailed on 8/8/05 (Saturday),*
   ○ *Dr. Carter detailed on 9/5/05 Labor Day.*

4.   Mann reported a call including a detail on Dr. Ammar Shaheen on 8/25/05.
*It was determined that Dr. Shaheen was not in the office and [was] out of town on this date.*

<u>Interview of Sales Representative Mann:</u>
. . .

On November 30, 2005, Sales Representative Mann was interviewed regarding these matters . . . .  She stated as follows:

"I, Theresa Mann, have met with Pharma Compliance Manager Lathell B. Thomas on 11/30/05 regarding an investigation of the irregularities in my sample and call activity records as described herein. The records described in this report are mine and I caused them to be prepared in the manner that they appear. No [t]hreats or promises have been made to me in connection with this investigation, and I have freely provided the following information in response to questions and in dialogue with Thomas.

I do not recall leaving expired samples at Dr. Connolly's office. . . . Thomas has advised me that I . . . left expired samples of Advair at Dr. Connolly's office but I don't recall this. If I left expired samples at this office it was inadvertent as I would not do this on purpose.

With regard to the calls noted to be made on weekends and the holiday, these were computer entry errors on my part. I actually made these calls on regular work days, but [I] entered them on the holidays and forgot to change the date on my laptop.

I acknowledge entering calls on pharmacies that I did not make. I have done this in the past because of pressure from management to keep up the call average on pharmacies. It was reported to me that ['a rep should have the common sense to report 4 calls a day,['] implying that the importance was to have the calls on paper. This comment was made to another rep by someone in upper management (not a DM). I did falsify these calls as I felt it [was] awkward to have all of GSK reps in pharmacies on a daily basis as this was making the pharmacists angry due to time constraints.

I do not recall exactly what happened in Dr. Shaheen's office on 8/25/05. It is possible that Dr. Shaheen was in Syria on that date and this was actually a staff call. I feel that staff calls in this office are very important as they (staff) make many of the decisions due to the fact that Dr. Shaheen is out of the country much of the time, and medications are still being filled for his patients. The computer does not allow such calls as these to be entered as staff calls any longer. I do not recall if this was either a staff call or if I actually saw Dr. Shaheen and did not sample[;] we as a team had agreed to quit leaving him samples for a time period to force him to write more prescriptions. We felt he was just giving away samples and not prescribing.["]

(*Id.* at 1-2 [emphasis in original].)  Under the sentence, "THIS IS A TRUE STATEMENT," Mann signed this statement.  (*Id.* at 2.)

On December 1, 2005, the following day, Ruzic called Mann and told her "a resolution had been reached in the investigation of [the] compliance issues."  (*Id.*, Ex. B ¶ 7; *id.*, Ex. A at 238, 251-52.)  Prior to this time, Ruzic, Planchard, and Barnette had decided to terminate Mann.  (*Id.*; doc. 15, Ex. 5 at 6-7.)  During the call, Mann told Ruzic "that [she] believed the reason she was being investigated was that Melanie was trying to get [her] fired."  (Doc. 12, Ex. A at 160.)  She told Ruzic that Anderson was having an affair with a District Sales Manager[3] and that Mann was a witness in three lawsuits filed by the Sales Representatives in December 2004.[4]  (*Id.* at 162, 241-44.)  Mann testified that she believed Anderson "was on [her] trail trying to get [her] fired because she had knowledge that [Mann] was going to be named in these lawsuits."  (*Id.* at 212.)

---

[3]The court notes that having a consensual affair is not a violation of Title VII. *Womack v. Runyon*, 147 F.3d 1298, 1299-1301 (11th Cir. 1998).  Therefore, any complaint about such an affair is not protected activity under 42 U.S.C. § 2000e-3(a)("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter . . . ."); *see also Little v. United Technologies, Carrier Transicold Division*, 103 F.3d 956, 960 (11th Cir. 1997).

[4]These three cases were *Cooke v. GSK*, 2:04-cv-3529-KOB; *Trowbridge v. GSK*, 2:04-3530-VEH; *McPherson v. GSK*, 2:04-cv-03531-WMA.  Each case was dismissed on Motion for Summary Judgment.  *See Cooke*, 2:04-cv-3529-KOB, doc. 22; *Trowbridge*, 2:04-3530-VEH, doc. 14; *McPherson*, 2:04-cv-03531-WMA, doc. 14.  None of these cases contained allegations of Anderson's alleged affair.  *See*, *e.g. Cooke*, 2:04-cv-3529-KOB, docs. 1, 16, 22; *Trowbridge*, 2:04-3530-VEH, docs. 1, 12, 14; *McPherson*, 2:04-cv-03531-WMA, docs. 1, 12, 14.

The following day, Mann sent an email to Planchard, Ruzic, and Barnette, which

stated:

> I wanted to make you aware of the recent Corporate Compliance issue. I am sure I know why this investigation was called, as every issue discussed leads back to my counterpart Melanie Anderson. We have not been on good terms for over 1 and 1/2 years. I believe this is due to my knowledge of inappropriate behavior between her and [a District Sales Manager].
>
> I will forward two emails showing the "payday Fridays" that I believe were expensed as [word deleted] was reported to pick up the tab.
>
> I have witnessed the two kiss after a lunch we had together upon departing.
>
> I have witnessed constant phone calls between the two. Melanie stated that she was not going to switch to corporate cell phone as she did not want the company to know who she talks to (this was stated in 2003).
>
> I have knowledge of [the District Sales Manager] expensing frozen steaks to be sent to Melanie Anderson and told his district she had done a big favor for him[.] [T]his was done during a district dinner.
>
> The two of them were on the National Conventions team and would arrange to work the same conventions together[;] [there] are reports of inappropriate behavior at these meetings.
>
> . . .
>
> I believe these two are attempting to intimidate others that are aware of their indiscretions[.] [T]his makes for an unfriendly working environment.

(*Id.*, ex. 6.) She did not mention that she was a possible witness in the pending lawsuits.

On December 5, 2005, Planchard and Ruzic told Mann that she was terminated. In

the Separation Notice, Ruzic wrote:

> This memo is to inform you that it has been determined that you have violated [GSK's] Employee Conduct policy. After reviewing the statement from the

9

information that was gathered during a Pharma Compliance investigation on November 30, 2005, the decision was made that you had falsified sample and call records and, as a result, your employment is being separated effective today.

Lathell Thomas, Pharma Compliance, met with you November 30, 2005. During the investigation the following information was confirmed:

- You reported calls in Passport for five pharmacies that were later confirmed to be closed for business . . . .
- You reported call and sample activity in Passport for holidays or weekends . . . .
- You delivered expired samples of Advair to the office of Dr. Michael Connolly . . . .
- You reported a call including a detail on Dr. [Ammar] Shaheen on August 25, 2005.  It was confirmed that Dr. Shaheen was not in the office on that date because he was out of town.

When asked for explanation of all these discrepancies, you admitted that you entered calls you did not actually make on the pharmacies mentioned.  You could provide no acceptable explanation for the call you entered on Dr. Shaheen, no acceptable explanation for the weekend and holiday calls reported and no acceptable explanation for leaving expired Advair samples with Dr. Connolly.  This conduct constitutes a serious violation of the Employee Conduct policy and, as a result, your employment is being separated today.

(*Id.*, Ex. A, ex. 7.)  When Planchard told Mann she was being terminated, Mann responded by saying, "[S]o, you're firing me because of some pharmacy calls, when you've got two reps that are having an affair and expensing it on company time?"  (*Id.*, Ex. A at 225-26.)  She did not testify that anyone mentioned the three pending lawsuits.[5]

_____

[5]In her EEOC charge, Mann does not mention that she told Ruzic about being named as a witness.  She stated that Sharon Koch from the Human Resources Department had called her on Friday, December 2, 2005, and had asked her about the affair.  (Doc. 1, Ex. A at 2.)  Her charge states, "In the beginning of this conversation, I told [Sharon Koch] that I was on a list of potential witnesses in several other lawsuits against GSK.  Becky McPherson, David Cooke, and Jill Trowbridge all filed EEOC charges against GSK, and all filed federal civil

In her deposition, Mann testified that she believed she had been instructed to falsify calls to pharmacies based on a statement Vivian Ryan, Marketing Development Manager, made to a Dothan Sales Representative, Gail Ponder.  (*Id*., Ex. A at 130, 148.)  She testified:

> Gail told me that the person in charge, Vivian Ryan – she's the person that put on the contest.  She's the person responsible for coming up with things to market, had ridden with Vivian Ryan, and Vivian said . . . can you believe that these people aren't seeing four pharmacies a day?  They should have enough sense to just put the call in and just say they did it.  How easy is that?  It was kind of  . . . look how simple it would be, just put the call in.
>
> So, to me, that's saying, this isn't really – we know this isn't a valid contest.  This is just for show.  You should just put it in the computer and – and look like you're doing what we want you to do.

(*Id*. at 139-40.)  Neither Ruzic nor Planchard instructed Mann to falsify her call records.  (*Id*. at 147-48.)

Mann filed an EEOC charge on May 30, 2006.  (*Id*., Ex. A, ex. 8.)  She received a Notice of right to Sue and filed this Complaint on April 26, 2007.  (Doc. 1 at 1 and Ex. B.)  In her Complaint, Mann alleges that GSK terminated her because she had "opposed unlawful practices, specifically by raising concerns about affairs between coworkers and managers and misuse of company funds, all of which arose out of employment discrimination lawsuits

---

rights lawsuits against GSK thereafter.  As of December 2005, all these lawsuits were pending in federal court in the Northern District of Alabama."  (*Id*., Ex. A at 2-3.)  Also, she does  not allege in her Complaint that she had told Ruzic about being a witness.  (*See* doc. 1 ¶¶ 11-23.)  However, for purposes of deciding the Motion for Summary Judgment, the court will assume that, on December 1, 2005, Mann told Ruzic she was on a list to be called as a witness.  (Doc. 12, Ex. A at 242-44.)

pending against the employer, or internal investigations relating to the same." (Doc. 1 ¶ 25.)

## III. <u>DISCUSSION</u>

Plaintiff claims defendant discharged her in violation of Title VII in retaliation for reporting an alleged affair and because she was named as a witness in discrimination suits. (Doc. 1 ¶ 25.-27)  She has not presented direct evidence of retaliation; therefore, she must prove her claims through circumstantial evidence under the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir. 2008).

> *McDonnell Douglas* and subsequent decisions have established an allocation of the burden of production and an order for the presentation of proof in ... discriminatory-treatment cases.  First, the plaintiff must establish a prima facie case of discrimination.  . . .  The burden [then] shift[s] to [the defendant] to produce evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason.  This burden is one of production, not persuasion; it can involve no credibility assessment.  [When the defendant offers] admissible evidence sufficient for the trier of fact to conclude that [the plaintiff] was fired [for a legitimate, nondiscriminatory reason], the *McDonnell Douglas* framework--with its presumptions and burdens--disappear[s], and the sole remaining issue [is] discrimination vel non . . . .

> Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.  And in attempting to satisfy this burden, the plaintiff--once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision--must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence.

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142-43 (2000)(internal citations and quotations omitted).

To establish a *prima facie* case of retaliation under Title VII, Mann must show:  (1) she engaged in statutorily protected expression; (2) she suffered a materially adverse employment action; and (3) the adverse action was causally related to the protected expression.  *See Butler v. Ala. Dept. of Transp.*, 536 F.3d 1209, 1213 (11th Cir. 2008). Plaintiff fails to establish her prima facie case on two grounds:  (1) she did not engage in protected activity and (2) she has not offered evidence of a causal connection between her complaint and her termination.

Section 2000e-3 of Title VII states:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  Plaintiff conceded at the hearing on the Motion for Summary Judgment that the facts of this case do not give rise to protected activity under the "opposition clause."   She contends, however, that she has engaged in protected activity under the "participation clause" of Title VII because she told Anne Ruzic in their telephone conversation of December 1, 2005, that she was on a list as a witness in a lawsuit filed by one of three employees.  Plaintiff testified that she told Ruzic that she "was on a list to be called as a . . . witness or to give some kind of testimony about the lawsuits."  (Doc. 12, Ex. A at

13

242.)  The record contains no evidence that plaintiff told Ruzic that the lawsuits involved discrimination or any other conduct prohibited by Title VII.  Indeed, plaintiff did not testify to discussing anything about the pending lawsuits other than the mere fact that one of the employees, Rebecca McPherson, had told her that she  was listed as a witness.  The court agrees with plaintiff that a plaintiff need not actually testify in a lawsuit to be entitled to protection under the "participation clause."  Nevertheless, plaintiff's mere statement to Ruzic that she was listed as a witness in one of three pending lawsuits against defendant is not sufficient as a matter of law to constitute participation under Title VII's retaliation clause.  Therefore, plaintiff has failed to establish the first element of her prima facie case of retaliation because she did not engage in protected activity.

To prove a causal connection, "a plaintiff need only establish that 'the protected activity and the adverse action were not wholly unrelated." *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993) (citations omitted).  In this case, Mann cannot establish a causal connection because she engaged in protected activity, telling Ruzic about the affair and about her status as a witness, *after* Ruzic and GSK had begun to "contemplate" her termination.  *See Clark County School District v. Breeden*, 532 U.S. 268, 272 (2001)(per curiam).  In *Breeden*, the Supreme Court held:

> The Court of Appeals reversed, relying on two facts:  The EEOC had issued a right-to-sue letter to respondent three months before Rice announced she was contemplating the transfer, and the actual transfer occurred one month after Rice learned of respondent's suit.  The latter fact is *immaterial* in light of the fact that petitioner concededly was *contemplating* the transfer *before* it learned of the suit.  Employers need not suspend previously planned [adverse

employment actions] upon discovering [protected activity], and *their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality*.

*Id*. (emphasis added and internal citations omitted).

Therefore, because defendant has presented undisputed evidence that it "contemplated" plaintiff's termination *before* she notified Ruzic of the affair and the fact that she may be called as a witness, plaintiff cannot establish a causal connection between her termination and her alleged protected activity. Therefore, because plaintiff cannot establish a prima facie case of retaliation, her claim will be dismissed.[6]

---

[6]The court pretermits a lengthy discussion of whether plaintiff has presented sufficient evidence that defendant's articulated reasons for her termination were a pretext and the real reason was retaliation. However, the court notes that the Eleventh Circuit has held:

> [W]e must be careful not to allow Title VII plaintiffs simply to litigate whether they are, in fact, good employees. The factual issue to be resolved is not the wisdom or accuracy of [the employer's] conclusion that [plaintiff] was an unsatisfactory employee. We are not interested in whether the conclusion is a *correct* one, but whether it is an *honest* one. Like all Title VII cases where pretext is an issue, *the question the factfinder must answer is whether [the employer's] proffered reasons were a coverup for a discriminatory decision*. We are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision.

*Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002)(internal citations and quotations omitted; emphasis added). In this case, Mann admitted that she had falsified her pharmacy call records, which was the first violation that Ruzic reported to Human Resources. She has not offered evidence on which a reasonable jury could find that defendant's legitimate, non-retaliatory reasons for her discharge were pretext for unlawful retaliation. Thus, even assuming plaintiff had sufficient evidence to establish a prima facie case, defendant would be entitled to judgment as a matter of law.

## <u>CONCLUSION</u>

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendant is entitled to judgment as a matter of law.  An Order granting defendant's Motion for Summary Judgment, (doc. 10), will be entered contemporaneously with this Memorandum Opinion.

**DONE**, this the 27th day of March, 2009.


*Sharon Lovelace Blackburn*
SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE